ST. PAUL FIRE & MARINE INS. CO. v. PACIFIC COLD STORAGE CO.

(Circuit Court of Appeals, Ninth Circuit.   October 14, 1907.)

No. 1,417.

1. INSURANCE—MARINE INSURANCE—ADMIRALTY JURISDICTION.

Sums paid out to avert a loss, which, if it had occurred, would have fallen upon the underwriter, may fairly be regarded as in the nature of salvage expenses, and may be brought within the meaning of the sue and labor clause of a marine policy; and the fact that there were expenses incurred to save the cargo alone, and that these expenses were incurred on land, cannot defeat the jurisdiction of a court of admiralty of a suit for their recovery under the policy.

2. SAME—SUE AND LABOR CLAUSE—EXPENSES OF SALVAGE OF CARGO.

Respondent issued a marine policy insuring libelant on a cargo of perishable goods which were to be shipped from Tacoma to Dawson, Yukon Territory, in vessels having refrigerating compartments.   The policy insured against ordinary sea perils, including stranding or collisions with any other vessel or with ice, and contained the usual sue and labor clause.   The cargo was shipped in one vessel to St. Michaels, and there transferred to another, both owned by the libelant, for transportation up the Yukon river.   The latter vessel was delayed several days by stranding, and, owing to the very low stage of water and the lateness of the season, the master telegraphed libelant's manager at Dawson, and had a light draft steamer sent down, to which a portion of the cargo was transferred.   On reaching Circle City in October, the river above had become partially closed by ice, and navigation was dangerous.   After consultation between libelant's master and manager, the refrigerating vessel was there laid up and the lighter one proceeded until frozen in 70 miles from Dawson.   The latter vessel had no refrigerating plant.   Both vessels were in danger of being crushed or disabled when the ice broke up in the spring, and in that event both cargoes would have been lost, owing to the nature of the goods and the impossibility of transporting them at that season, without refrigeration, even if not destroyed.   After consultation between libelant and a representative of respondent, with the latter's consent, both cargoes were transported to Dawson by land during the winter.   Held, that the cargo was in a position of peril from risks insured against, and that the expense of such transportation was within the sue and labor clause of the policy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1255.]

3. SAME.

In such case libelant was not required to jettison a part of the cargo for the purpose of lightening the vessel, instead of transferring a part to another vessel; the latter course not being in violation of any provision of the policy.

4. SAME—PERIL TO CARGO THROUGH DELAY—STRANDING.

The vessel used for the Yukon voyage having been seaworthy when such voyage commenced, the fact that her boilers afterward developed leaks owing to her frequently stranding, by reason of which she was somewhat delayed, did not invalidate the policy, where but for the delays caused by stranding, which was a peril insured against, she would have completed the voyage in safety.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1111.
Marine insurance.—Perils of the sea, see note to 19 C. C. A. 465.]

5. SAME.

The fact that respondent dealt with libelant with knowledge that it was the owner of both the cargo and vessel did not warrant the claim that it was its duty to deliver the goods at their destination at its own expense, which could not have been required of it as carrier after the continuance of the voyage became impossible.

157 F.—40

·6. SAME—ADJUSTMENT OF LOSS.

> While an adjuster of a·loss under an insurance policy cannot· decide questions of law where they are the sole questions in controversy, he is required to pass on such as are incidentally necessary to a determination of the items which are within the terms of the policy.

Appeal from the District Court of the United States for the North-.ern Division of the Western District of Washington.

Ira Bronson, D. B. Trefethen, and F. R. Wall, for appellant.
W. H. Bogle, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

HUNT, District Judge. The Pacific Cold Storage Company of Ta-·coma, Wash., appellee, brought this suit against the St. Paul Fire & Marine Insurance Company, of Minnesota, to recover $51,188.30, and interest and costs, upon a claim upon an adjustment made under a pol-·icy of marine insurance for $60,000, issued on July 30, 1903, by the St. Paul company, appellant, to the storage company, appellee, upon a cargo of refrigerated meats, merchandise, cannery supplies, and pro-·duce, laden in the ship Elihu Thompson, on a voyage from Tacoma, Wash., to Dawson, Yukon Territory.

The policy is known as a "cargo and freight, English form" policy, .and, among other clauses, has the following:

> "Warranted free from particular average unless the vessel or craft be strand·ed, sunk, or burnt, each craft or lighter being deemed a separate insurance.
>
> "Underwriters notwithstanding this warranty, to pay for any damage or loss caused by fire or by collision with any other ship or craft, or with ice, or with .any substance other than water, and any special charges for warehouse rent, reshipping or forwarding, for which they would otherwise be liable; also to pay the insured value of any package or packages which may be totally lost in transhipment. * * *
>
> "And these said assurers promise and agree that the insurance aforesaid shall commence upon the freight and goods or merchandise aforesaid from the loading of said goods or merchandise on board the said ship or vessel at as .above and continue until the said ·goods or merchandise be discharged and :safely landed at as above. And that it shall be lawful for the said ship or ves-sel to proceed and sail to and¹ touch and stay at any ports or. places whatsoever in the course of her said voyage for all necessary purposes without prejudice to this insurance. And touching the adventures and perils which the capital .stock and funds of these said assurers are made liable unto or are intended to be made liable unto by this insurance they are of the seas, men-of-war,· fire, ·enemies, pirates, rovers, thieves, jettisons, letters of mart and counter mart, :surprisals, takings at sea, arrests, restraints, and detainments of all kings, :princes, and people of what nation, condition, or quality soever, barratry of the master and mariners, and of all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the aforesaid subject-matter of this insurance or any part thereof. And. in case of any loss or misfortune, it shall be lawful to the insured, their factors, servants and assigns, to sue, labor and travel for in and about the defense, safeguard and recovery -of the aforesaid subject-matter of this insurance or any part thereof without prejudice to this insurance, the charges whereof these said assurers will bear in proportion to the sum hereby insured. And it is expressly declared and agreed that no acts of the insurer or insured in recovering, saving or preserv-ing the property ·insured shall be considered as a waiver or acceptance of .abandonment. * * *"

It appears that the appellee is engaged in the business of the sale of refrigerated products in Alaska, and that it owns refrigerating plants

at Tacoma, Wash., at Nome, Dawson, and at other points in Alaska. It also owns the steamship Elihu Thompson and the river steamer Robert Kerr, both of which are equipped with refrigerating compartments. The appellee buys its products in the markets of Seattle, Tacoma, and San Francisco, and, after freezing them, carries them by the steamship Elihu Thompson to Alaska. Those goods which are to go to Dawson are transferred at St. Michaels from the Elihu Thompson to the Robert Kerr. The Robert Kerr used to carry them up the Yukon river to Dawson. For the winter time, the Dawson market being inaccessible from the outside, supplies are shipped during the summer months in sufficient quantities to last over. The appellee also owned a barge called the "Peter," which was carried as a tow by the steamer Robert Kerr. In July, 1903, the appellee shipped on the Elihu Thompson a cargo of refrigerated products, together with some hay and feed stuffs, to go to Dawson. The Elihu Thompson reached St. Michaels in due course, and there transferred the refrigerated cargo to the steamer Robert Kerr, and put the hay and feed stuffs upon the barge Peter. The Kerr, with the barge in tow, left St. Michaels on the 28th of August, 1903, bound for Dawson. At the time that the voyage from St. Michaels commenced, the engineer's log shows "everything working well." There were some delays encountered on August 28th; the log showing that they were "stuck" on the flats waiting for the tide. On August 29th they were aground on mud flats a short distance from the mouth of the Yukon river. The engineer found considerable scale in the boilers, which were cleaned on that date. On August 31st the steamer entered the mouth of the river. There was some delay by reason of a strong offshore wind blowing, but the steamer went ahead with her tow, and reached Ft. Yukon about September 19th. There was more or less leaking of the boilers during the voyage. The evidence shows that the river was at a very low stage; and the master decided that, as the water was very low and winter was coming on, it would be impossible for him to get to Dawson with his barge in tow. He therefore left the barge at Ft. Yukon, and the Kerr went up the river. The Kerr reached a point about 30 miles above Ft. Yukon on September 22d, and then stranded on a bar or point known as "Two Pipe Slough." The Kerr was unable to get off the bar until September 28th, or six days after she had stranded. It appears, however, that while the Kerr was stranded, as just stated, Capt. Smith, the master, believing that he could not take his boat to Dawson, telegraphed to the appellee in Dawson, and asked it to send down a light draught steamboat. The representative of the appellee at Dawson chartered the steamer Lightning, and sent her down to relieve the Kerr. Meantime the Kerr was floated. The Lightning met the Kerr on October 7th at a point about 12 miles below Circle City, where, on account of the low water, it was thought best to transfer a portion of the cargo of the Kerr to the Lightning. This was done, and the Kerr and the Lightning went up the river and reached Circle City on October 10th. The Yukon river was falling. Ice was forming, and navigation became hazardous. Mr. Bryant, manager of the cold storage company, who had gone down from Dawson on the steamer Lightning, and the captain of the Kerr, consulted

what was best to do, and, believing that it was impossible to get the Kerr to Dawson during the season, concluded to run her ahead in a slough near by, and to lay her up for the winter. They believed, though, that the Lightning, with a smaller cargo, and less draught, could get through to Dawson. A part of the cargo of the Kerr—about 100 tons—was transferred to the Lightning, and she proceeded toward Dawson. The Lightning had no refrigerator plant, so that part of the cargo was necessarily loaded close to the boilers. The Lightning was also towing a barge with about 12 tons of cargo. The Lightning and the barge got as far as Washington Creek, which is about 70 miles below Dawson, and the ice became so thick that they could proceed no further, so that on October 13th the steamer was frozen in. Bryant himself went to Dawson, and arrived there about the 20th of October. About October 31, 1903, Bryant, the agent of the appellee, negotiated with one H. N. Ford to haul the cargo on the Lightning from Washington Creek to Dawson. Subsequently, on December 19th, by advice of appellee, a second contract was made to haul the cargo from the Kerr. Forty tons of the Kerr's cargo was kept on that steamer in Circle City until the break-up in the spring of 1904, when the Kerr took the goods to Ft. Yukon, where she got the barge Peter, with its cargo, and went up to Dawson, reaching there in May, 1904.

The evidence goes to show that in the spring the temperature along the Yukon river often rises above the freezing point for many days before the river is clear of ice and navigable. When this condition of weather comes, immense quantities of floating ice form jams at different points, so that oftentimes the pressure of the ice from above forms a mass which arises as high as 40 or 50 feet, backing up sometimes for a distance of from 8 to 10 miles; that, when these jams break, great volumes of water and ice go down, and are apt to injure or destroy a steamer lying below the jam. A report was made to the appellee that the steamers were frozen in, and the appellee reported the facts to the appellant, the insurance company. About November 8th Mr. Harrison, a general agent of the appellant, went to Seattle to look into the situation, and determine what course should be taken. Mr. Bogle testified that he represented the appellee, and discussed with Mr. Harrison the advisability of moving the cargo in order to avoid a total loss. They also discussed a possible abandonment of the cargo to the underwriters, and the probable expense of the removal of the cargo. He said that Mr. Harrison deplored possible abandonment, and finally told him that, as the cold storage company was more familiar with the conditions in the Alaska country than he, he wished they would take such steps as they deemed necessary for the safety of the cargo, and that that would be satisfactory to him. Mr. Bogle told Mr. Harrison that the expense of moving the cargo would be very heavy, and asked if the insurance company would advance the money to cover the expense. Mr. Harrison said that while it was not customary to advance any money until vouchers were all gathered in, and the total loss or expenses ascertained and adjusted, yet, under the circumstances, he recognized that it would be a hardship to the cold storage company to have to advance so large a sum of money, and that he would endeavor to get the underwriters to make an advance of $25,-

000 for the purpose of moving the cargo. The cargo was removed from the Lightning to Dawson during November and December, and the greater part of the cargo of the Kerr was removed during January, February, and March, 1904. Bills for the expense of the removal of the cargo were received by the appellee at Tacoma, and copies or originals were sent from time to time to the insurance company. There was a delay in an advance of funds by the insurance company, but on June 2, 1904, the company did advance the sum of $15,000 to the cold storage company toward the forwarding expenses. When all the cargo had been removed, and the expense vouchers had been received, the insurance company requested the cold storage company to have the claim placed in the hands of an adjuster. Mr. E. A. Alexander, of San Francisco, was agreed upon by the parties. He made the adjustment, and found the insurance company to be liable on the loss to the amount of $51,188. In the adjustment all expenses connected with the sending of the Lightning down the river to the relief of the Kerr when the latter was stranded were treated as general average expenses chargeable to all interests involved. He regarded the expense of removing the Lightning cargo from Washington Creek to Dawson, and the expense of removing the Kerr's cargo from Circle City to Dawson, as sue and labor expenses incurred for the benefit of the cargo alone. The court below disallowed the items of the adjustment grouped under the head of general average, but allowed the forwarding expenses, and made a decree accordingly, deducting the $15,000 previously advanced. From this decree appeal was duly taken.

Appellant contends that the court as a court of admiralty had no jurisdiction. The argument is substantially that the expenses of forwarding the property covered by the policy of insurance were not incurred because of any peril underwritten in the policy, or because of any misfortune arising out of any peril underwritten. This, in effect, is saying that the expenses incurred in forwarding were a land venture undertaken by appellee to transport its property to Dawson. It is perfectly clear that the sue and labor clause of the contract of insurance made between the parties hereto is a proper part of a maritime contract. Expenses incurred under such a clause are maritime in their nature, when they arise out of some peril insured against, or because of misfortune arising out of a peril insured against. Justice Story, in his great opinion in De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776, said:

"There is no more reason why the admiralty should have cognizance of bottomry instruments as maritime contracts than of policies of insurance. Both are executed on land, and both intrinsically respect maritime risks, injuries, and losses."

Sums paid out to avert a loss, which, if it had occurred, would have fallen upon the underwriter, may fairly be regarded as in the nature of expenses of salvage, and may be brought within the meaning of the sue and labor clause of a marine policy. The fact that there were expenses incurred to save the cargo alone, and that these expenses were incurred on land, cannot defeat jurisdiction, where the contract of insurance is against perils or misfortunes that may come to the dam-

age of the property insured, and where, as in the present case, the insured is authorized to sue labor and travel for the safety of the subject-matter of the insurance, or any part thereof, without prejudice to the insurance. The weight of the evidence is that the expenditures were made partly for the safety of cargo and vessel, and partly in the saving of the cargo alone from loss and peril. There is no room to dispute jurisdiction in a suit upon an insurance policy to recover general average expenses, and why should it be held that appellee must resort to a court of law to recover expenses which are within the sue and labor clause merely because they were incurred for the benefit of the cargo alone? We perceive none, and believe that the contract of insurance made between appellant and appellee is maritime, that it involved rights arising wholly in maritime commerce, and that the lower court was correct in exercising jurisdiction. Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90.

It is contended by the appellant that the cargo of the Kerr was not exposed to any peril under the terms of the policy, that it was merely delayed, and that the appellee was not entitled to expend any amount under the sue and labor clause, because, it argues, the said clause was not applicable "to a case of remote and future peril, but to an immediate danger or present loss, and not under any circumstances to a case of delay alone." We cannot sustain appellant's contention. The Kerr stranded on the bar at a point known as "Two Pipe Slough" on September 22d. She lost six days in trying to get over the bar. Had it not been for this delay, it is safe to assume that she would have reached Dawson about the 26th. The river was falling rapidly at the time, the ice was forming, so that after the 28th it was deemed impossible to get the Kerr through to Dawson with her entire cargo on board. The situation was a hard one. The judgment of the master of the Kerr and the manager of the appellee company was that the boat might get through if she could be relieved of part of her cargo, and that the Lightning and the Kerr, with comparatively light cargoes, could get through. But, when Circle City was reached, the river had fallen greatly, and the ice was dangerous to navigation. It was known that steamers which had just passed up the river had suffered on account of low water and ice. Some decision was imperative, so it was thought best to have the Kerr tie up at Circle City, and to send the Lightning forward, hoping that, by reason of her lighter draught, she would get through. The slough in which the Kerr was moored was the best place that could have been chosen thereabouts, according to the evidence, although men of long experience with conditions on the Yukon river say that the Kerr and the Lightning were both exposed to great danger in their winter quarters. The danger of leaving the cargo on the Lightning was that if it was exposed to the temperature, which would rise above freezing point in the spring, it would be ruined, while there was also the danger that the boat would be crushed by the ice in the spring. The Lightning had no refrigerator on board, and undoubtedly the decision that it was necessary to remove the cargo from her was wise. The goods on the Kerr were unquestionably safe while they were on board the boat, because they were in refrigerated chambers, but there

was great danger to the Kerr and to the cargo that the boat would be crushed and disabled by the break-up of the ice in the spring. It was reasoned that, if the Kerr should be destroyed in the spring, the goods would be lost, or, if she should be disabled, it would be practically impossible to forward the goods to Dawson soon after the opening of navigation, because there was no other boat with a refrigerator on board. Under the circumstances, therefore, the master and appellee were justified in deciding to forward the goods to Dawson during the winter, when the temperature was such that removal could be had without danger.

We are satisfied that peril to the boat of being destroyed or disabled by masses of floating ice coming down in the spring was one covered by the policy of insurance issued by appellant to appellee, and that, when it was determined to send the goods overland rather than to leave them on the boat, with the risk of total loss in the spring, the decision was made with regard to the safety of the goods themselves. Moreover, the insurance company knew the facts, and was satisfied that the assured should use its best judgment to save the cargo by moving it overland to Dawson. The agent of the insurance company knew just where the boats were. He was advised that it was thought best to remove the cargo overland, he knew the probable cost of moving each pound of cargo, and he acquiesced in the opinion that it was best to move it, rather than to take the risk of a total loss by the breaking up of the ice in the spring. The insurance company fairly agreed also to make an advance toward the expense of removing the goods, and, it is just to say, led the assured to believe that when the removal was completed and the vouchers showing the total expense were received, and the claim adjusted, the underwriter would pay such a proportion of the expense of removal as it might be liable for under its policy of insurance. What proportion of the expenses should be borne by the underwriters was left open for subsequent determination; but the reasonable inference from the whole evidence is that there was no contention in respect to the wisdom of forwarding the goods overland to Dawson. We therefore conclude that the cargo was in a position of peril, and that the expense of removing it was incurred by the assured with the consent of the underwriter to avert a probable total loss from the peril then pending. The peril was a peril of the sea; and, as the goods would probably have been a total loss unless removed and forwarded to Dawson during the winter, the expenses of so forwarding them became a consequence of the peril. Hubbell v. G. W. Ins. Co., 74 N. Y. 254; Phillips on Insurance, §§ 1127, 1128; Bryant v. Insurance Co., 13 Pick. (Mass.) 543.

The appellant urges that the terms of the policy were invalidated by splitting up the voyage and separating the insurable risks, which should have all contributed to a general average loss, and by the refusal of the appellee to sacrifice such part of the cargo as was necessary to enable the Kerr to proceed up the river, if any peril or loss occurred. It is argued that, if peril occurred as a result of a delay to the Kerr in proceeding up the river, it affected all of the interests which were a joint venture, at least until the occurrence of the peril, and it is said that if it was necessary to lighten the boats, the Kerr or the Peter, or

both, appellant had its rights, and, among them, a right that the appellee should sacrifice enough of the cargo to enable the remainder to be proceeded with. It is suggested that the Kerr could have lessened her draught by jettison of a part of her cargo, saving a large part of it. We do not find that this contention has support in the evidence in the case. The rules of jettison are not applicable. As to the nonperishable cargo, it was on the Peter. The adjuster and the court took the invoice value of the entire cargo, to which was added the insurance premium, and then expenses were apportioned as between the underwriter and the assured. The separation of a portion of the cargo in transferring it from the Elihu Thompson to the Kerr and the barge did not invalidate the insurance of the goods upon the Kerr. Again, no claim was made against the underwriter for any loss or expense incurred on account of the cargo upon the barge, though the underwriter had the benefit of the value of the barge cargo in apportioning the forwarding expenses of the other cargo.

This brings us to the contention of the appellant that the policy never attached to the goods shipped because the Kerr was unseaworthy when the goods were loaded on the Elihu Thompson, and when they were transshipped on board the Kerr. After a careful reading of the evidence, we find that the Kerr was seaworthy when she commenced her voyage at St. Michaels. It is undoubtedly true that her boilers began to leak soon after her voyage commenced. But the testimony of the engineers in charge, and of the boiler maker who overhauled the boilers when the steamer was at St. Michaels, and before the commencement of her voyage, is that the boilers were in excellent condition when the steamer left St. Michaels. The weight of the evidence is to the effect that the boilers were subjected to a standard hydrostatic cold water test, and that they stood the test very well. After the vessel left St. Michaels, she was frequently on ground, and there was from time to time an accumulation of sediment around the boiler tubes. Leaks developed on the trip up the river, yet, notwithstanding the delays by reason of running aground, and delays by reason of necessity for cleaning and repairing the boilers, it is plainly inferable that at the speed the Kerr was making on the voyage she would have reached Dawson about September 28th, had she not stranded on the 22d, and been grounded for six days. Watson et al. v. Insurance Co. of North America, Fed. Cas. No. 17,285; Nome Beach L. & T. Co. v. Munich Assurance Co. (C. C.) 123 Fed. 820; Cooley's Briefs on Insurance, p. 1253 et seq.

It is said that the Kerr was overloaded and burdened with the barge; but it satisfactorily appears that she was not overburdened with cargo, while in taking her tow she was making the voyage as it had been usually made by her and other steamers of her class. Inasmuch as we believe that the Kerr was seaworthy, it is not important that we express an opinion whether the contract of insurance for the voyage from Seattle or Tacoma to Dawson was one indivisible agreement. It seems to us, though, that under the clause of the policy that each craft or lighter was deemed a separate insurance the correct view would be that a distinct liability was assumed when the goods were reloaded at St.

Michaels, and that the general rule of implied warranty of seaworthiness as a condition precedent would have to be applied.

The appellant argues that the expenditures were grossly disproportionate to the necessities of the case, so much so as to be wholly unreasonable, under the facts and the law.   It is said that the record discloses a desire on the part of the appellee to move the goods to Dawson at the fastest possible speed in order to meet the Christmas trade. The contract for hauling the goods appears to have been the most favorable that could have been obtained under the circumstances.   The agent of the appellant was notified that the cost of forwarding the goods from the steamer Lightning would be about $12\frac{1}{2}$ cents a pound, and from the Kerr about 15 cents a pound.   With that knowledge, therefore, and having participated in the decision to have the goods forwarded, the appellant is not in a position to urge with strength that the expenditures were disproportionate to the necessities of the case. It is undoubtedly correct that the owner desired to have the goods in Dawson as soon as possible after it was decided that they were to be removed, inasmuch as it believed that the markets would enable it to make sales if it could get the goods into Dawson before Christmas; but at the same time as it was necessary, under the circumstances, that the goods should be removed, we believe quick removal was proper.

It is claimed by the appellant that it was the duty of the appellee, as a shipowner, in order to earn its own freight, to forward the cargo to destination, and that the appellant had such an interest in the goods as an insurer as entitled it to rely upon the performance of this duty. When it became impossible, however, for the boat to carry the goods to Dawson, the carrier could have elected to abandon the voyage, and could have notified the owner to take charge of his goods.   Phillips on Insurance, § 1493.   A carrier is not obliged to forward goods overland in order to save his freight, where the expense would exceed the total amount of his freight money.   But in the present case the facts are that the owner forwarded the goods, and did so with the knowledge and approval of the insurance company.   Appellee's interest in forwarding the cargo was not as a carrier, but as an owner, and appellant, by its agent, dealt with appellee as owner.

It is finally contended that the adjustment made was simply an ex parte opinion of the adjuster based upon misconstruction of matters considered by him, and that, in the adjustment, he eliminated the interdependent rights and liabilities of the parties, and contributory values under the principles of general average.   But it was right that the adjuster should have the documents and expense vouchers before him while he was adjusting the loss.   He had to have evidence which would explain the charges, the nature of the expenditures, together with the reasons why they were made.   When he came to pass upon items that belonged properly under the sue and labor clause of the policy, he was also obliged to determine whether the goods were exposed to peril or loss covered by the terms of the policy.   And was it not necessary that the adjuster should have passed upon the question whether it was or was not reasonable for the assured to have incurred expenses in averting the loss, and to find what expenses were so incurred?   We believe it was.   It was for the safety of the goods that they were removed and

forwarded to Dawson. There was no intention to put the cargo back on the boats when it had been put on shore. In such a case, under the doctrine laid down in the case of the L'Amerique (D. C.) 35 Fed. 835, the charges and expenses incurred for the safety of the cargo ought to be charged against the cargo alone. We do not doubt that an adjuster cannot decide questions of law where they are the sole questions in controversy, but we find here that he only considered and acted upon those matters which were appropriately before him, and that his decision was not an arbitrary one, nor were his conclusions purely those of law.

The lower court decided that the respondent—appellant here—cannot be made liable for any part of the items of expense included in the so-called general averages included in the adjustment made by the adjuster, and directed that the decree should be for the insurer's proportion of the forwarding expenses, as adjusted, less the sum of $15,000, which had been paid by the insurance company. This was correct, and the decree was entered accordingly.

We find no error of which appellant can complain. The decree is affirmed.