### JEFFCOTT v. ÆTNA INS. CO.
### No. 265.

Circuit Court of Appeals, Second Circuit.

July 15, 1942.

See, also D. C. S. D. N. Y., 32 F.Supp. 409, overruling exceptions to the libel.

D. Roger Englar, of New York City (Bigham, Englar, Jones & Houston, Leonard J. Matteson, and George S. Brengle, all of New York City, on the brief), for respondent-appellant.

George C. Sprague, of New York City (Carpenter & Stevenson, John Tilney Carpenter, Allan A. Baillie, and J. Roland Stevenson, all of New York City, on the brief), for libelant-appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This case arises out of damage sustained by the yacht "Dauntless" during the hurri-

cane of September, 1938. Libelant, Robert C. Jeffcott, owner of the yacht, has recovered on two marine insurance policies covering the yacht. On appeal, respondent, Aetna Insurance Company, raises several questions, the most important of which are whether there is admiralty jurisdiction, whether the owner can recover for a "constructive total loss," and whether the damage and subsequent cost of repair were properly ascertained.

The "Dauntless" was an auxiliary three-masted schooner of some 500 tons used as a pleasure craft. In June, 1938, two policies of insurance—one a hull policy for $240,000 and one a disbursements and shipowners liability policy for $80,000—were issued by respondent covering a one-year period. Both policies provided that the insured warranted that the yacht would be "laid up and out of commission at the Thames Shipyard, New London, Conn.," during the currency of the policies. Accordingly, the yacht was towed to New London and laid up. During the hurricane on September 21, 1938, the yacht broke loose from the moorings and drifted about 500 feet inshore, where she settled on some submerged hulks. Water entered the hull and flooded the engines, salons, cabins, and other portions of the interior. The owner immediately had the vessel examined by advisers, and on the basis of their report and his own inspection was convinced that the cost of repair would exceed $150,000. On advice of counsel that a constructive total loss could be claimed under the policies, abandonment was tendered. This was declined.

The boat was eventually salvaged by respondent, and various surveys were made as to damage and cost of repair. Libelant filed a claim for the full amount of both policies, plus sue and labor expenses, and when this was not accepted, filed his libel. Respondent first admitted admiralty jurisdiction, but later amended its answer to deny it. After a hearing, Judge Bondy in the district court upheld the jurisdiction and trial was had. On the merits, libelant was successful; and respondent was held for the full value of both the hull policy and the disbursements policy, with interest, and for sue and labor expenses, for a determination of which reference to a commissioner was made. D. C. S. D. N. Y., 40 F.Supp. 404. Respondent appeals from the determination of full liability, but does not contest liability for sue and labor expenses. Fuller statements of relevant facts will be made in

connection with the various points to be discussed.

## I. Jurisdiction.

The jurisdictional question arises because of the provision in the policies that the owner warranted that the yacht would be laid up and out of commission. Both parties agree that admiralty jurisdiction over contracts exists when the subject matter of the contract is maritime. It is also agreed that the subject matter of marine insurance is maritime. De Lovio v. Boit, C.C.Mass., 7 Fed.Cas. page 418, No. 3,776; New England Marine Ins. Co. v. Dunham, 11 Wall. 1, 20 L.Ed. 90. Accepting these labels as counters for decision, the question then is whether this insurance policy is a policy of marine insurance. That, in turn, becomes a question whether the insurer assumes risks which are marine risks.

By its terms the policy covers marine risks. The insurer assumes the risks of the perils of the seas to the vessel insured. The policy contains the traditional language of the admiralty, and provides for settlement in the traditional way, including the insured's privilege of abandonment if the ship is a "constructive total loss." Respondent now asserts that the maritime nature of this policy was destroyed by its having required the vessel to be laid up. What the insurer really did was decrease the quantum of risk, i. e., decrease the likelihood of loss. It did not change the type of risk, which remained marine in nature. This can be demonstrated by examples of what could have befallen this ship without breach of warranty by the owner. The yacht could have been set adrift by vandals and run aground; it could have been hit by another ship; it could have been stolen and injured by poor navigation; and it could have been, as it actually was, damaged by a hurricane. These are all risks which a marine insurer anticipates and on which he calculates his premiums. They are risks peculiar to ship and sea. A non-marine insurance company might be familiar with damage from fire, theft, storm; it would not be prepared to assume such risks where the insured article was a ship. It would recognize that the risk took on a different character when a ship became the object insured.

The marine nature of the risk can be further demonstrated. As libelant points out, many policies require pleasure yachts to be laid up during certain seasons. Clearly, this is related to such factors as the seaworthi-

ness of a yacht during rougher seasons and the quantum of risk in terms of the portion of the policy's life in which loss is likely. This practice is hardly an attempt to divide the year into maritime periods and non-maritime periods. To reduce this example further, if the yacht were endangered by a nearby fire while laid up, or if governmental authorities ordered the boat yard cleared, and the yacht were towed out to sea and there damaged, the risk would certainly be maritime. This being the case, it becomes a little absurd to declare that admiralty jurisdiction depends on fortuitous circumstances such as these. If there were a change in the nature of risk involved, respondent might be justified in asserting that maritime character disappeared. But when it seeks only to diminish the likelihood of damage from perils of the seas it seems gratuitous to tell it that unwittingly it ceased being a marine insurer.

That this is the correct approach is shown by the leading cases on admiralty jurisdiction over marine insurance. Mr. Justice Story on circuit wrote an exhaustive opinion on maritime contracts in general when deciding that marine insurance was within admiralty jurisdiction. De Lovio v. Boit, supra. He was faced with the English rule —apparently built up by Lord Coke as part of his opposition to the admiralty, as well as chancery—that jurisdiction over contracts was dependent on locality, just as was admiralty tort jurisdiction. In breaking away from this rule, he covered in all contracts that "relate to the navigation, business or commerce of the sea." In New England Marine Ins. Co. v. Dunham, supra, Justice Story's rule was adopted in general and as to marine insurance in particular. Mr. Justice Bradley's language in this case clearly adopts a broad rule of covering in insurance protecting ships against the perils of the sea. He notes all the peculiarities of maritime law in determining losses. He observes that insurance as a loss distribution device originated in maritime law. And he points out that marine insurance law forms a part of the maritime law of all countries. True, he does not define marine insurance, but his use of the words indicates that he meant it in a general sense, and not in the particular sense of certain types of marine insurance related to the sea in a special way.

Respondent argues, however, that some of Justice Bradley's language indicates a restriction of admiralty jurisdiction over marine insurance. It points out that he said of the contract of insurance, "in effect, it is a contract, or guaranty, on the part of the insurer, that the ship or goods shall pass safely over the sea, and through its storms and its many casualties, to the port of its destination." 11 Wall. at page 30, 20 L.Ed. at page 99. These are not words of limitation. Justice Bradley was faced with overturning the English rule as to jurisdiction based on locality. His words are pointed to that problem, and not to the question of delimiting the scope of marine insurance. This same answer is relevant to Mr. Justice Story's quotation about contracts which relate "to the navigation, business or commerce of the sea." Here again, the opinion was pointed to establishing a new rule, not to limiting jurisdiction to certain types of marine insurance. Moreover, common sense would indicate that insurance against the perils of the sea is "business" or "commerce" of the sea, whether the insured ship be loaded or unloaded, moving or laid up. And certainly, such insurance would have been included within those two words as they were used in those days. See Hamilton and Adair, The Power to Govern, 1937, 73, 94, 107-8, 160-1; Timberg, Insurance and Interstate Commerce, 50 Yale L.J. 959, 970. We conclude that the nature of the insurance policy here involved is such that it comes within admiralty jurisdiction.

It may not be amiss to observe that, though this precise question appears not to have arisen, other marine insurance issues have come up, and in them the courts have generally accepted admiralty jurisdiction simply on the ground that the Supreme Court in the Dunham case had settled the issue. See The Dolphin, D.C.E.D.Mich., 7 Fed.Cas. page 862, No. 3,973; The Guiding Star, D.C.S.D.Ohio, 9 F. 521; The Paola R., C.C.E.D.La., 32 F. 174; Kerr v. Union Marine Ins. Co., D.C.S.D.N.Y., 124 F. 835, reversed on other grounds, 2 Cir., 130 F. 415, certiorari denied 194 U.S. 635, 24 S.Ct. 858, 48 L.Ed. 1160; The Daisy Day, D.C. W.D.Mich., 40 F. 538; North German Fire Ins. Co. v. Adams, 7 Cir., 142 F. 439; St. Paul Fire & Marine Ins. Co. v. Pacific Cold Storage Co., 9 Cir., 157 F. 625, 14 L.R.A., N.S., 1161; Robinson, Admiralty, 1939, 163. We may also note that great reliance has been placed on analogies of other types of contracts where distinctions have been made between ships engaged in active service and ships laid up. The difficulty is that these distinctions in their own field are generally

unreal,[1] and their continued life rests on their settled nature, not on their merit. See Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 244, 41 S.Ct. 65, 65 L.Ed. 245. We see no value in erecting another set of unreal distinctions here, when it can be demonstrated that the contract in issue fairly fits the original rule laid down.

## II. The Rule of Damage.

The second question to be considered is whether the owner may claim a constructive total loss if the damage to his yacht is only slightly more than 50 per cent of the repaired value of the ship. Respondent asserts, relying principally on Pezant v. National Ins. Co., 15 Wend., N.Y., 453, that under the circumstances here it must be shown that the cost of repair would equal or exceed the value of the yacht when repaired. This issue was originally considered and decided adversely to respondent by Judge Coxe on exceptions to the libel. 32 F.Supp. 409.

■ It is quite clear that if a shipowner is entitled to claim a constructive total loss, he must show only that the cost of repair exceeds 50 per cent of the repaired value of the ship.[2] Marcardier v. Chesapeake Ins. Co., 8 Cranch 39, 47, 12 U.S. 39, 3 L. Ed. 48; Arnould on Marine Insurance, 12th Ed. 1939, § 1117; Couch on Insurance, 1929, §§ 1722, 1784; Vance on Insurance, 1930, p. 861; Phillips on Insurance, 5th Ed. 1867, § 1535. We do not understand respondent to contest this. It argues, however, that there is an exception expressed in the Pezant case which makes the abandonment rule inapplicable when the damaged ship arrives at the home port of destination prior to tender of abandonment. Phillips on Insurance, 5th Ed. 1867, § 1555, is also relied on for the same exception. In view of the peculiar result which would follow if the exception were applicable here where the yacht was not to leave port during the life of the policy, it is necessary to examine the origin of the exception.

The New York court in the Pezant case appears to have taken the exception from Marshall on Insurance, published in 1810. This old treatise does not clearly distinguish between total loss and constructive total loss. It seems to say only that a loss is total or partial, and that it is the latter "if a ship, insured for a given voyage, arrive at her port of destination, and there remain 24 hours moored in safety; or if she be insured for a *term*, and she survive the term." Ibid. p. 486 (italics in original). The authorities cited by Marshall do not make it clear that there is a special rule of the sort claimed in the Pezant case. These authorities, Cazalet v. St. Barbe, 1 T.R. 187; Furneau v. Bradley, Park 166; Fitzgerald v. Pole, Willes 641, all decided in the eighteenth century, came at a time when it was not even clear what was insured against. Lord Mansfield had claimed that insurance covered only a voyage and that if it were lost the safety of the ship was immaterial, but others said that it was on the ship for the voyage and that the return of the ship prevented a total loss. See Arnould on Marine Insurance, 12th Ed. 1939, § 1104. It was from cases of this period that Marshall extracted his rule that the New York court used.

It is also clear that the nature of constructive total loss had not yet been thoroughly worked out. In Marcardier v. Chesapeake Ins. Co., supra, Mr. Justice Story observed that as of that time, 1814, the exact quantum of a constructive total loss had not been determined by the English courts. And see Carver, Marine Insurance, 18 Int.L.Asso. Rep. 110, 1899. If the exception in the Pezant case is part of a constructive total loss rule, it could hardly exist in England, for the English rule of constructive total loss is the same as the Pezant rule—i. e., that cost of repair exceed repaired value. Yet if the Pezant rule has a sound basis, it must come from the English cases referred to above. But these English cases say that in the event of a return of a ship to the home port, only a partial loss can be claimed. Such is not the English rule today. Marine Insurance Act 1906, § 60(2).[3] Thus, it can be concluded only that the Pezant case is a strange phenomenon, not fitting into the general pattern of marine insurance law.

---

[1] For example, a distinction has been drawn between a vessel dredging a channel, and a vessel dredging to obtain sand to fill in a tract of land. "Of course, the dredging deepened the water where the material was removed; but that was merely incidental to the work being done." J. C. Penney-Gwinn Corp. v. McArdle, 5 Cir., 27 F.2d 324, 325, 59 A. L.R. 1342.

[2] The English rule is different. See note 3, infra.

[3] The act says that there is a constructive total loss if "it is unlikely that [the insured] can recover the ship * * * or the cost of recovering the

The peculiar nature of the rule of the Pezant case becomes clear when an attempt is made to discover the reason for it. In Peters v. Phœnix Ins. Co., 3 Serg. & R., Pa., 25, a case which repudiates the Pezant exception, it is argued by the court that the English cases relied on—largely the ones mentioned above as used by Marshall in his treatise—are cases where the insurance had expired. Certainly, Marshall's statement of the rule can be so read. If the rule is one depending on expiration, then the court in the Pezant case misread it, for there the ship put into port before the time policy had run. A more likely explanation is that the court in the Pezant case was using an indirect approach to the rule that abandonment must be decided upon at the time the ship is in peril or reasonably soon thereafter. It might be said that otherwise the shipowner could gamble by having his ship limp to port. If ship values were up, actual repairs might be profitable; if ship values were down, abandonment might be more profitable. Such a choice would hardly be fair. But to prevent this, it is not necessary to rely on an exception to the moiety rule; the requirement of quick election to abandon covers the case.

■■ To give currency to this peculiar exception expounded in the Pezant case would result in many difficulties in connection with time policies. Shipowners would be without the ordinary privilege of abandonment if their ships happened to be in port when damaged. And where, as here, the ship was not to be moved, abandonment under the American rule would not exist. We believe the Pezant case is not consistent with the general rules of constructive total loss. The American rule is the moiety rule, and applies wherever the ship is when damaged.[4]

### III.  Quantum of Damage.

The district court found that the cost of repair to the yacht was $150,399.18, and that the value of the yacht under the terms of the insurance contract was $240,000. Judge Clancy also found that under another part of the constructive total loss rule, abandonment is permissible if it is reasonable to believe that the vessel is in imminent peril of total loss, and that such was the case here. 40 F.Supp. 404. Since we agree that the repair cost exceeded 50 per cent of the value of the yacht, we intimate no opinion on the propriety of the finding of imminent peril of total loss.

■ The major item of repair cost is found from a series of bids called for by libelant. There were eight bids ranging from $74,926 to a top bid of $169,374.76. The district court took the fourth bid of $114,719. The lowest bid was eliminated because the court was not convinced of its genuineness, partly on account of unsatisfactory explanations by officers of the bidder as to how they made up the bid and partly because there was a secret agreement between respondent and the bidder that the latter would be indemnified up to $10,000 for extra costs. We think it was reasonable to exclude this bid under these circumstances. The second and third bids, $93,873 and $109,350, respectively, were eliminated because no evidence was offered "authenticating" them. To this respondent replies that they were binding bids and good evidence of a bona fide estimate of cost. Though respondent argues that the trial court has discretion in choosing which bid most nearly approximates true cost, we may assume for the moment that the bid of $93,873 should have been considered. Subtracting an insurance cost which was disallowed and adding costs which are conceded, the repair cost rises to $114,079.44. There are five remaining items which are contested. Two of them, cost of renewing running rigging and cost of repairing the winter house, will, if accepted, bring the total above $120,000. If we accept these two, it will be unnecessary to consider the objections to utilization of the others. We are

ship * * * would exceed [its] value when recovered"; or in the case of damage to a ship "that the cost of repairing the damage would exceed the value of the ship when repaired." In Hall v. Hayman [1911], 2 K. B. 5, 14, Bray, J., said he did not suppose the "Legislature intended to alter the common law." In 18 Halsbury's Laws of England, 2d Ed., p. 364, the only change from the common law noted is one making it slightly more difficult to establish loss.

[4] It is argued that the 50% rule is harsh. That may be. But so long as it is the rule, we see no reason to lessen its harshness by an illogical and largely fortuitous exception. When "constructive total loss" was used in the policies involved in this suit, the parties hardly visualized the Pezant exception as part of the rule. They undoubtedly thought of the 50% rule as governing.

588

not to be understood as rejecting the other items; for example, the cost of examining the foremast, $798.67, seems proper, even though not primarily a repair or restoration. Certainly a damaged yacht would not be considered as made fully whole so long as there remained doubt as to the condition of the foremast.

■■ The objection to the cost of renewing running rigging is that the rigging remains serviceable and that the only reason for substitution is the need for rigging on a yacht to be "bright with the color," not "old and gray." But this is a policy on a yacht; and if items of repair are knocked out because on a tramp steamer things would not have to be gay and colorful, the whole purpose of insuring an expensive pleasure yacht is lost. Whatever merit there is to respondent's argument that cost of repairs must be limited to putting the vessel into a navigable condition holds only for ordinary seagoing vessels. Pleasure yachts are peculiarly subject to high cost of repair, and insurance coverage runs high for this very reason. It seems proper, therefore, to include such an item as renewing rigging. The second item, cost of repairing the winter house, is objected to because it is also an expense unconnected with putting the vessel in a navigable condition. But the winter house was part of the yacht as insured, and its loss is part of the loss suffered. The nature of the vessel, a pleasure yacht destined frequently to be laid up, calls for this protective covering. It is proper to include it in computing cost of repair. We conclude that, at the minimum, cost of repair exceeds $120,000.

■ Respondent claims, however, that not $240,000, the face of the hull policy, but $320,000, the combined amounts of that policy and the disbursements policy, is the repaired value of the yacht. A reading of the two contracts clearly demonstrates this error. The hull policy sets the value at $240,000, and the disbursements policy repeats this sum as the value under the hull policy. The disbursements policy also says that "a total and/or constructive total loss paid by Underwriters on hull to be a total loss under this Policy." This indicates that the initial determination is to be made on the hull policy, where $240,000 is given as the value. There was no error in taking $120,-000 as 50 per cent of the repaired value.

Affirmed.