540 F.2d 1257
 EAGLE LEASING CORPORATION, Olin Corp. and Nilo Barge Line,
Inc., Plaintiffs-Appellees,
v.
HARTFORD FIRE INS. CO., Defendant-Third-Party Plaintiff-Appellant,
v.
NAT'L CASUALTY CO., etc., et al., Third-Party Defendants.
 No. 74-3858.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 22, 1976.
 
 Overton T. Harrington, Jr., Brunswick G. Deutsch, New Orleans, La., for plaintiff-appellant.
 George A. Frilot, III, New Orleans, La., for plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before WISDOM, COLEMAN and GEE, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This appeal presents an unusual question involving the construction of the Protection and Indemnity (P & I) coverage afforded by a policy of marine indemnity insurance. The Hartford Fire Insurance Company (Hartford) appeals from a district court holding that it must indemnify the insured, Olin Corporation (formerly Olin Mathieson Corporation), and its affiliates, Eagle Leasing Corporation, and Nilo Barge, Inc. (collectively referred to as Olin), for attorneys' fees and expenses incurred in the defense of a suit against Olin by Sun Oil Company. See E.D.Tex. 1974, 384 F.Supp. 247. The fleet policy was issued and delivered to Olin in St. Louis, Missouri, on January 1, 1967, and also included coverage for Hull and Machinery, Cargo, and Charter's Legal Liability. The policy period was three years subject to payment of renewal premiums that were to be recomputed annually on the basis of Olin's loss record.
 
 
 2
 The renewal premium for 1969 quoted to Olin in December 1968, was $583,000, more than double the rate for 1968. Hartford asserts that this increase was due to extensive fleet losses during 1968. Olin soon notified Hartford that it intended to seek coverage with other insurers. After Hartford had granted two extensions of its existing policy in January 1969, Olin obtained fleet insurance from new insurers. Its policy with Hartford was terminated by mutual consent on January 27, 1969. All premiums accruing through that date were paid.
 
 
 3
 Before the termination of the Hartford policy, Olin experienced a fleet loss at sea. On November 16, 1968, Barge NL-701, owned by Eagle Leasing, but under bareboat charter to Olin and sub-charter to Nilo Barge, sank in the Gulf of Mexico about 50 miles from Galveston, Texas. Search and salvage operations were initiated soon afterwards. The bow of the vessel was raised to the surface by February 13, 1969, but the stern remained embedded in the mud bottom eleven fathoms below. At this point, severe weather caused the salvage operations to cease. During the ensuing storm the barge split into two sections. Further recovery efforts were later conducted, continuing into March 1969, when they became economically unwarranted. Olin then abandoned and sold the sunken wreck of the barge.
 
 
 4
 About two years later, on February 10, 1971, Sun Oil Company sued Olin for damage to its tanker, the S/S WESTERN SUN, which allegedly had struck Olin's sunken barge on February 14, 1969, Sun Oil's complaint alleged, in part, that Olin "failed and refused to remove" the barge and that it "failed and refused to light" or to "properly mark" it. Neither Hartford nor Olin had notice of the claim or loss before Sun filed suit. Olin tendered its defense to Hartford under the P & I provisions of its earlier policy with Hartford. The tender was refused on the ground that there was no coverage.[1] Olin retained its own attorneys who tried the collision case on the merits. The district court denied any recovery by Sun Oil in its judgment, entered on January 29, 1973, on the ground that the Western Sun had struck an unidentified underwater object, not Olin's barge.[2]
 
 
 5
 Meanwhile, Olin had commenced this action on June 2, 1971, seeking to establish its right to indemnification for attorneys' fees and expenses for defending the collision suit. The district court tried the case on stipulated facts and briefs. It held that the unambiguous and clear meaning of the P & I provisions of the policy created a legal obligation on the part of Hartford to indemnify Olin for its expenses in defending the Sun Oil suit. 384 F.Supp. at 250-251. "But even when such rules (relating to ambiguous insurance contracts) are applicable, adoption of any reasonable construction favorable to the Assured is mandatory." Id. at 251. We respectfully disagree with the district court's reading of the contested provisions, and with its statement of the rule of construction to be applied in this case.
 
 
 6
 * The Hartford policy states that the coverage provided Olin is "in consideration of the payment of the premium for loss or damage which occurs during the policy period stated in the declarations . . ." This part of the policy was omitted when the policy was introduced as an exhibit; it appears however in the complete policy found in the supplemental appendix. The district court asserted in its opinion that the "policy does not require, necessarily, that a loss occur during the policy premium term". Id. at 250.
 
 
 7
 The relevant portion of the P & I policy reads:
 
 
 8
 It is agreed that if the Assured, as shipowners, shall have become liable to pay, and shall have in fact paid, any sum or sums in respect of any responsibility, claim demand, damages and/or expenses, or shall become liable for and shall pay any other loss arising from or occasioned by any of the following matters or things during the currency of this policy in respect of the ship hereby insured, that is to say:
 
 
 9
 (a) Loss or damage in respect of any other ship or boat, or in respect of any goods, merchandise, freight or other things or interests whatsoever, on board such other ship or boat, caused approximately or otherwise by the insured vessel, in so far as the same is not covered by the Running Down Clause in or attached to the policies on Hull and Machinery.
 
 
 10
 (b) Loss or damage to any goods merchandise, freight, or other things or interests whatsoever, other than as aforesaid, whether on board said vessel or not.
 
 
 11
 (c) Loss of life or personal injury, and for payments made on account of life salvage.
 
 
 12
 (d) Loss or damage to any harbor, dock, graving, or otherwise, slipway, way, gridiron, pontoon, pier, quay, jetty, stage, buoy, telegraph cable, or other fixed or movable thing whatsoever or to any goods or property in or on the same.
 
 
 13
 (e) Any attempted or actual raising, removal or destruction of the wreck of the insured vessel or the cargo thereof, or any neglect or failure to raise, remove or destroy the same.
 
 
 14
 (f) Liability for loss, damage or expense incurred in connection with or in resisting any unfounded claim by the master or crew or other persons employed on the vessel named herein, or in prosecuting such persons in case of mutiny or other misconduct.
 
 
 15
 (g) Net loss due to deviation incurred solely for the purpose of landing an injured or sick seaman in respect to port charges incurred, insurance, bunkers, stores, and provisions consumed as a result of the deviation.
 
 
 16
 This company will, subject to the reservations herein mentioned, pay to the Assured such proportion of the sum or sums so paid, for such loss, as the amount insured by this policy bears to the policy value of the ship hereby insured, and in case the liability of the Assured has been contested, with the consent in writing of two-thirds of the Underwriters on the ship hereby insured in amount, this Company will, subject to the conditions of this policy, also pay a like proportion of the costs which the Assured shall thereby become liable for and shall pay. (Emphasis added.)
 
 
 17
 The court read this language as providing coverage
 
 
 18
 upon the occurence of any of the listed matters or things during the premium term of the policy. The policy does not require, necessarily, that a loss occur during the policy premium term. One of the "matters or things" listed in Section (e) is neglect or failure to raise, remove, or destroy the wreck of an insured vessel. Therefore, the policy, as it applies to this item, reads as follows:
 
 
 19
 "It is agreed that if the Assured, as shipowners, shall have in fact paid any sum in respect of any expenses arising from or occasioned by any neglect or failure to raise, remove, or destroy the wreck of the vessel during the currency of this policy, this Company will pay to the Assured the sum or sums so paid."
 
 
 20
 In the prior suit, Sun Oil alleged that there had been neglect in raising or removing the Barge NL-701. At the time of the alleged striking by the S/S WESTERN SUN, the Barge NL-701 had been wrecked approximately three months. Of this period, all but approximately two weeks occurred during the policy's premium term. Clearly, Sun's lawsuit charged neglect during the currency of this policy. Therefore, the policy provided coverage beyond question.
 
 
 21
 Id. at 250.
 
 
 22
 The trial judge considered this conclusion bolstered by the distinctive language used in section (e). The six other sections each refer to either "loss", "damage", "injury", or "liability". He stated that, before an obligation to indemnify arises, one of these matters must have occurred during the policy premium term. He felt that because those terms are not used in section (e) only neglect to raise or remove a vessel must have occurred during the policy premium term, i. e. before January 27, 1969, to establish an obligation to indemnify.
 
 
 23
 We are unable to share the district court's conviction that the quoted language has an unambiguous meaning. The court, applying strict grammatical rules, asserts that the phrase "during the currency of this policy" must modify the words nearest it, i. e. "matters or things". It is far from conclusive that the time-qualifying phrase "during the currency of this policy" modifies "matters or things". Notwithstanding the terminology used in Sections (a) through (g), the quoted language makes equally good sense if the time-qualifying phrase modifies the term "loss" in the phrase "any other loss". It can also be argued that the former phrase modifies the objects of the first two verb phrases in the clause, i. e. "sum" or "sums". Moreover the phrase "currency of this policy" is qualified by the opening declaration that the coverage is "in consideration of the payment of the premium for loss or damage which occurs during the policy period stated in the declarations".
 
 
 24
 In our view ambiguity[3] pervades these provisions. In the first instance, it is uncertain which words are modified by the phrase "during the currency of this policy". We do not feel compelled to apply, or, indeed, justified in applying the general rule that an insurance policy is construed against the insurer[4] in the commercial insurance field when the insured is not an innocent but a corporation of immense size, carrying insurance with annual premiums in six figures, managed by sophisticated business men, and represented by counsel on the same professional level as the counsel for insurers. In substance the authorship of the policy is attributable to both parties alike. See Canton Ins. Office v. Independent Transportation Co., 9 Cir. 1914, 217 F. 213. Significantly, the policy in question is not the usual printed form but is what is known as a "manuscript" policy, containing some standard printed clauses but confected especially for Olin. It is true, of course, as the trial judge observed, "scriveners of insurance policies are acutely aware of the meaning and effect of the language". We comment: So too, are counsel for large companies carrying fleet insurance with annual premiums in six figures. There is no purpose in following a legal platitude that has no realistic application to a contract confected by a large corporation and a large insurance company each advised by competent counsel and informed experts.
 
 
 25
 The court's interpretation obscures the essential question of what is the "currency" of the policy. In a sense, the currency of a policy refers solely to the period in which premiums are paid. In another sense, the policy has a currency as long as whole or partial coverage is afforded. The district court's reading renders this policy current in this respect for as long as the sunken barge can give rise to losses which must be indemnified. This construction would give the insured perpetual coverage without payment of premiums, an actuarial nightmare, in an insurance situation where the premiums are recomputed annually. In this perspective, the policy provisions should be construed to give a reasonable meaning that most closely reflects the probable intentions of the parties to the insurance contract. "It is thought, too, that unless the language is so clear and strong as to prevent such a construction, the contract should be interpreted not only so that it may stand, but that it may stand as a reasonably practicable commercial undertaking: that is, of two possible constructions, that which is most reasonable from a business point of view should be taken." 9 Arnould, Marine Insurance § 105, p. 88 (1961 Ed.)
 
 II
 
 26
 Because the district court found these provisions to be unambiguous, it did not need to consider what law governs this task. Its opinion, nonetheless, indicated that Missouri law controlled any future determinations as to an award for prejudgment interest, or penalties and attorneys' fees for vexatious refusal to pay an insured loss. 384 F.Supp. at 251. This choice of law is also correct in regard to the rules of construction we are to apply. In the absence of specifically controlling federal authority, the law of the state where a marine insurance contract is issued and delivered governs the construction of its language. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337; Irwin v. Eagle Star Ins. Co., 5 Cir., 455 F.2d 827, cert. denied, 1972, 409 U.S. 852, 93 S.Ct. 118, 34 L.Ed.2d 95.
 
 
 27
 Of course, in Missouri, as in other jurisdictions, the rule of thumb is that if the meaning of a policy provision is doubtful and the language used is susceptible of different constructions, the one most favorable to the insured is adopted. See Baltimore Bank & T. Co. v. United States Fidelity & G. Co., 8 Cir. 1971, 436 F.2d 743, 746; American Insurance Co. v. First Nat'l Bank in St. Louis, 8 Cir. 1969, 409 F.2d 1387, 1390; McMichael v. American Ins. Co., 8 Cir. 1965, 351 F.2d 665, 669. Under Missouri law, however, again as in other jurisdictions, this rule should not be employed automatically: "(I)nsurance contracts are to be reasonably construed consonant with the apparent objective and intent of the parties". Baltimore Bank & T. Co. v. United States Fidelity & G. Co., 436 F.2d at 746. See American Insurance Co. v. First Nat'l Bank in St. Louis, 409 F.2d at 1390; Mid-Continent Stores, Inc. v. Central Sur. & Ins. Corp., Mo.App.1964, 377 S.W.2d 567, 568.
 
 
 28
 In deciding what a reasonable construction of the contested provisions is, the material we may draw from consists of those provisions, the policy as a whole, and the apparent objectives of the parties in establishing this kind of contractual relationship. This task is not simple. There appears to be no previous judicial construction of similar P & I provisions. And, the cited language is susceptible to more than one meaning.
 
 
 29
 The reading given by the district court is literally correct as far as it goes. When the phrase "any other loss arising from or occasioned by any of the following matters or things during the currency of this policy" is read in conjunction with section (e), the expenses related to the defense of the Sun Oil suit appear to be covered by the policy. The key language is the phrase "arising from" which connotes that only some preliminary event leading to an eventual loss must have occurred during the currency of the policy. On the other hand, the alternative phrase "occasioned by" connotes that there must be actual causation of the loss during the currency of the policy. Assuming that these phrases are not redundant, the use of the "arising from" language indicates that coverage may exist for losses related to an alleged failure to raise the wreck beginning during the policy premium term but culminating in some kind of damage after that term has expired.
 
 
 30
 It remains, however, to look to the quoted P & I provisions as a whole to determine whether this reading is consistent with a coherent and contractual agreement. First, it is important to note the structure of this lengthy provision. The term "Assured" operates as the subject of a long clause beginning with the word "if" and ending with section (g). That clause and the four preceding words do not form a coherent sentence. To make sense they must be read with the sentence that follows. The second significant feature of this clause is that it contains parallel sets of double verb phrases. The first set, "shall have become" and "shall have paid", is in the future perfect tense. The second set, "shall become" and "shall pay", is in the future tense. Each of these sets of verbs has a direct object or objects. The objects of the first set are "sum" and "sums" followed by the phrase "in respect of any responsibility, claim demand, damages and/or expenses". The object of the second set of verb groups is "loss". It is , of course, the effect of the phrases that follow that word as modifiers that is disputed.
 
 
 31
 The essential difficulty we have in accepting the district court's reading of these provisions is that it deprives the remaining portions of the clause of a reasonable meaning. We feel compelled to construe the quoted provisions as a whole in such a manner as to give them a coherent meaning most closely approaching what the parties reasonably intended. Our pursuit of this meaning compels us to reach a construction that does not afford Olin coverage for its costs in defending the Sun Oil suit.
 
 
 32
 The first aspect of our objection to the district court's reading is that the semi-clause consisting of the first set of verb groups, objects, and related modifiers does not give a meaning that the parties could have reasonably intended unless the phrase "during the currency of this policy" is read into it by way of parallel construction. The alternative to this reading is a contractual agreement requiring Hartford to indemnify Olin for any sums it actually has become liable for and has paid as shipowners. There would be no time qualification on this kind of indemnity. Thus, we read this semi-clause as requiring indemnification for certain monetary liabilities incurred and paid during the premium term of the policy.
 
 
 33
 Assuming that the contested time-qualifying phrase modifies the direct objects in the first semi-clause, it follows that this phrase was intended to have the same usage in the second semi-clause. In that context it modifies "any other loss", thus giving the meaning that coverage extends only to losses occurring during the premium term of the policy. For indemnification purposes, a loss occurs during the policy premium term when an event that gives rise to potential liability and litigation, such as the alleged collision in this case, happens during that term. This construction is supported, however, by more than the stylistic convention of parallel construction.[5] The extension of coverage required by the district court's reading runs sharply against the risk calculation principles of insurance. That argument is highly persuasive in the factual context this case presents.[6] If a former insured fails to raise a sunken vessel over an extended period of time after the premium term of a policy has expired, the risk to the insurer is incalculable. Although Hartford's risk in retrospect was bounded by the abandonment and sale of the sunken barge, there was no guarantee that Olin would take these steps. Olin in fact argues that the coverage found by the district court related to a neglect to raise or remove the barge beginning during the policy premium term and that this coverage should continue indefinitely without further payment of premiums.
 
 
 34
 Our conclusion is undisturbed by the trial judge's suggestion that such coverage is reasonable because the major portion of any negligence in failing to remove the barge took place during the premium term, i. e. before January 27, 1969. The obligation to indemnify under this policy does not depend on contingent circumstances such as chronological proximity to the date the policy was terminated. Coverage is either grounded upon the intentions of the parties as expressed in the language of the policy, or, if ambiguities are present in the language, upon a reasonable construction of its terms. Because there is no reasonable construction of the P & I provisions which affords coverage to Olin for its defense of the Sun Oil suit, we are unable to construe the doubtful policy language in favor of the insured. The judgment of the district court must therefore be reversed.
 
 
 35
 As a final note, we observe that the equities in this case do not appear to favor a decision for either party. Olin's efforts to remove the barge under the "sue and labor" provisions of the policy unquestionably enure to the benefit of Hartford by minimizing Hull losses through salvage. But this circumstance does not necessarily entail a windfall from Olin's salvage operations. In the first instance, Hartford's coverage was in effect during a substantial portion of the time recovery efforts were actually conducted. Its consideration for that coverage was the premium. Since Olin's actual losses in 1968 apparently exceeded its projected losses by a large amount, it may be assumed that Olin received reasonably priced insurance through the policy termination date. Moreover, since the barge was not successfully removed, the potential savings to the insurer from the salvage operations were sharply limited.
 
 
 36
 On another point, Olin's contention that a finding of non-coverage leaves it effectively uninsured under the P & I provisions in instances of potentially enormous third party liability due to the five day policy termination provision has limited merit. In the event of a marine disaster similar to the Wychem 112 incident which involved a toxic chemical, see Wyandotte Transportation Co. v. United States, 1967, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407, the insured party might indeed find itself exposed to potentially enormous liability. This argument, however, ignores two salient factors. First, Olin, like many other fleet owners or bareboat charterers, has a large "umbrella" liability policy which provides coverage for losses and liabilities not otherwise provided for in its P & I policies. This umbrella insurance is the major protection against catastrophic loss.[7] The second factor is that the five day policy termination provision may be exercised unilaterally by either the insured or the insurer. This provision is the product of bargaining between large corporate entities and is advantageous to the insured or the insurer depending on contingent circumstances such as fleet losses and competitors' insurance rates. These factors support the argument that lack of coverage is at least not unjust.
 
 
 37
 The district court's statement that an owner could not be expected to continue to insure a sunken vessel is also unpersuasive. As long as the sunken barge could give rise to significant liability, Olin could reasonably be expected to maintain insurance on it. The sunken vessel in this case constitutes only a small portion of the insurable risk related to the appellees' fleet. And, as pointed out, Olin is protected under an umbrella liability policy with another insurer, except for the operation of a $100,000 deductible. In this perspective, there is no discernible hardship worked on any of the parties to this suit by a finding of coverage or non-coverage.
 
 
 38
 The judgment of the district court is REVERSED.
 
 
 
 [1]
 According to the pleadings, Sun Oil Company charged failure to mark a wreck, not failure to raise a wreck. The policy does not cover failure to mark a wreck, nor does it cover defense of risks not assumed. Although the court below states that liability was asserted against Olin "on the basis of negligent failure to promptly remove the wreck", in fact Sun's complaint charged Olin with failure to mark the wreck and the Findings and Conclusions of the court below reflect that this was the claim asserted
 
 
 [2]
 The court found that "the evidence is insufficient to determine whether the impact of the collision between the S/S Western Sun and the barge, if there was such a collision, caused the barge to split into two sections, or whether the barge split because of the pounding it took in the rough weather and heavy seas". The court also found, in the alleged collision case, "this evidence is conflicting with all the other evidence offered by plaintiffs and defendants. It is unquestionably insufficient to justify the court in finding from a preponderance of the evidence that the plaintiff's vessel actually only struck the bow section of the barge, which had drifted from its original location"
 
 
 [3]
 The ambiguity we find, however, is in the nature of the second type described in the following passage:
 ambiguity. The word as here used includes not only those ambiguities that leave the reader genuinely puzzled which of two interpretations is right, but also those in which one of these, probably the more natural grammatically, is clearly not what the writer meant. The fault of this kind of writing is not so much obscurity as clumsiness.
 H. Fowler, Modern English Usage, 21 (2d ed. 1965).
 
 
 [4]
 An insurance is usually a "contract of adhesion", where the insured has no bargaining power. Only for this reason, is the policy construed against the insurer. See Judge Frank's discussion of this principle in his dissenting opinion in Siegelman v. Cunard White Star, 2 Cir. 1955, 221 F.2d 189, 204
 
 
 [5]
 Parallel ideas should be expressed in parallel structure
 For the expression of co-ordinate ideas a noun should be paralleled with a noun, an active verb with an active verb, an infinitive with an infinitive, a subordinate clause with a subordinate clause, and so forth.
 J. Hodges, Harbrace Handbook of English, 284 (1948).
 
 
 [6]
 Hartford concedes that it has found no authority holding directly that an insurer may not be bound to cover a risk indefinitely. It contends, however, that "for an insurance policy to be valid it must contain an agreement as to the period of duration of the risk assumed". 12 Appleman, Insurance Law and Practice § 7176, p. 172 (Supp.1974). We do not need to consider the merits of this proposition since our decision rests on a construction of what the parties reasonably intended by the use of the particular policy language in this case. We hold that that language does not encompass indefinite P & I coverage for expenses related to a failure to remove vessels which have sunk during the policy premium term. In other circumstances indefinite coverage without continued premium payments might be the result of unambiguous contractual language. It might result as well from a judicial construction of ambiguous policy language holding that the parties reasonably intended such coverage in view of the policy taken as a whole and relevant circumstances such as the feasibility of risk calculations
 
 
 [7]
 The liability of the umbrella underwriters is subject to a $100,000 deductible. Here the costs and expenses are substantially less than $100,000