797 F.2d 257
 GULF FLEET MARINE OPERATIONS, INC., Plaintiff,
v.
WARTSILA POWER, INC., Defendant-Third-Party-Plaintiff-Appellant,
v.
NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY,
Third-Party-Defendant-Appellee.
 No. 85-3592.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 20, 1986.
 
 J. Francois Allain, New Orleans, La., for defendant-third-party-plaintiff-appellant.
 Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill, James R. Sutterfield, Nancy A. Donovan, New Orleans, La., for third-party-defendant-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 This admiralty case is a coverage dispute between an insurer and its insured. The insured, while overhauling a diesel marine engine, failed to repair and inspect properly a coupling connecting the piping between the lube oil pump and the engine. At sea, one of the pipes vibrated out of the coupling, causing severe damage to the engine. The insured settled the resulting suit by the ship owner for 44% of the original claims.
 
 
 2
 We first review the district court's limitation of the insurer's obligation to 44% of the amount of the covered claims, and then decide whether damage to any engine part worked on was properly excluded from coverage, regardless of whether the work was faulty. We affirm.
 
 
 3
 * The M/V TAURO DEL GOLFO, owned by Gulf Fleet Marine Operations, was a specialized offshore supply vessel powered by two 16-cylinder, 3600 horsepower Nohab Polar F216V diesel engines.[1] In 1983, the vessel underwent scheduled yard upkeep, overhaul, and regulatory body inspection at Fredeman Shipyard. After inspection of the vessel's main engines, Gulf Fleet hired Wartsila Power to overhaul them, an operation that required removing and replacing all cylinder heads, cylinder liners, pistons, connecting rods, main bearings and rocker arms, but not the original engine block and crankshaft. After the work, the TAURO DEL GOLFO sailed for Mexico, with two Wartsila mechanics aboard. At stops along the way, the mechanics and crew made further repairs and modifications to the fuel and lube oil lines.
 
 
 4
 The ship was equipped with an alarm system that monitored critical engine performance and fluid levels, including the lube oil pressure. While at anchor in the Gulf, approximately a month after Wartsila's repairs, a member of the crew turned the alarm system off in order to drain engine coolant and add a rust inhibitor, but failed to reactivate it when he finished the work. Ten minutes after getting underway, the captain noticed a problem with the ship's thrust, and ordered the engineers to go below to investigate. They discovered that the port main engine's lube oil line had separated at a coupling, and that the engine had virtually self-destructed when nearly all of the engine's 600 gallons of lubricating oil were pumped into the bilge area. Because the alarm had been disconnected, the crew was unaware of the condition, and the engine ran until the pistons seized and a connecting rod penetrated the engine block. Operating on the remaining starboard engine, the vessel departed its job location in the Gulf of Mexico and returned to Louisiana, where Wartsila repaired the port engine at a cost of $336,222.78.
 
 
 5
 The coupling that failed joined a short section of pipe from the oil pump to a 14-foot run of pipe leading to the oil filter. The coupling provided a liquid proof seal while allowing the pipes to move or vibrate independently of one another. A later investigation disclosed that the coupling's gaskets may have been damaged when the pipes were disturbed during the overhaul and realignment of the engine, causing the pipe to only marginally engage the coupling. The oil starvation and ensuing engine damage occurred after the pipe simply vibrated out of the coupling.
 
 
 6
 After learning of the failure of the port main engine, Wartsila advised its insurer, Northbrook Excess and Surplus Insurance Company, of a possible claim, and provided notice to Northbrook when Gulf Fleet later sued Wartsila for faulty and improper repairs, breach of contract, breach of warranty, strict liability and negligence in repairing the engine. Northbrook denied coverage and proposed to defend under a reservation of rights. Wartsila rejected the tender of defense and filed a third party complaint against Northbrook. Recognizing that the duty to defend is broader than the duty to indemnify under Louisiana law, Northbrook provided independent counsel to represent Wartsila.
 
 
 7
 Gulf Fleet settled its claims against Wartsila for $215,129.46, or approximately 44% of its original claim for $487,934.81. Though Gulf Fleet released all claims against Wartsila in the settlement, the parties did not allocate specific amounts of the settlement figure to the items of damage alleged in Gulf Fleet's complaint. The settlement expressly reserved for later determination Wartsila's coverage claim against Northbrook.
 
 
 8
 The district court held a hearing on the merits of the coverage dispute, issuing factual findings and legal conclusions from the bench. The central dispute revolved around the fact that the settlement figure was not broken down into separate elements, because some of the originally claimed items of damage were within coverage, and others were not. Wartsila argued that because the total settlement figure was less than the total of the original claims for items within coverage, it was entitled to indemnity for the entire settlement amount. Northbrook, on the other hand, argued that the settlement figure included some items of damage covered by the policy, and some that were not, and that it was obligated to indemnify Wartsila only for that portion of the settlement figure representing claims within coverage. The district judge, once the positions of the parties became clear, stated:
 
 
 9
 I hold that the document you submitted to me does not give you the right to claim a hundred percent on every covered item, when all you paid was 44% on the entirety of it.
 
 
 10
 I hold that the insurer is entitled to a similar reduction, where the documents do not indicate how much is paid for any category.
 
 
 11
 After this determination, the judge turned to the issue of coverage. Wartsila's attorneys introduced the original policy, containing an additional declarations page with an "if any" endorsement for "completed operations." Although Northbrook had originally contended that Wartsila did not purchase coverage for completed operations at all, on the basis of the submission the court held that the "if any" endorsement bound the insurance company to coverage of completed operations. The district court then determined that the policy contained two relevant exclusions, excluding damage resulting from "faulty workmanship" by Wartsila, and excluding certain damages arising out of completed operations. The court construed the provisions together as excluding from policy coverage any damage to engine components that Wartsila actually performed work on.
 
 
 12
 The court found that Wartsila had not worked on the crankshaft or engine block, and that their repair costs of $149,350.00 were within coverage. Northbrook conceded that the claim of $98,900.00 for downtime lost by the vessel while being repaired was also covered. Finally, the court rejected coverage for consequential damages of $52,812.00 incurred in bringing the vessel back to the repair yard, finding that the ship would have had to return to Louisiana anyway for repairs to the engine parts that were outside coverage; alternatively, it held that Wartsila had not met its burden of proof to the contrary.[2]
 
 
 13
 In this appeal, Wartsila argues that the district court should not have reduced its recovery to 44% of the original covered claims; and that if such reduction was proper the exclusion for completed operations was ambiguous and should not have been enforced, so that only the damage from faulty workmanship to the coupling itself was not within coverage.II
 
 
 14
 Northbrook's comprehensive general liability policy, with a broad form comprehensive general liability endorsement, provides that:
 
 
 15
 The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence....
 
 
 16
 (emphasis added). In its settlement with Gulf Fleet, Wartsila was able to reduce its legal obligation to Gulf Fleet for both covered and non-covered claims to 44 cents on the dollar. Because the parties did not specify the amount paid for each element of damage in the settlement figure, the district court correctly assumed that the 44% reduction applied across the board to each of the original claims. Accepting Wartsila's argument--that because the settlement figure was less than the total of the original covered claims, it was entitled to indemnity for the entire amount--would require Northbrook to indemnify Wartsila for non-covered claims. The district court correctly avoided this result by holding that Wartsila was entitled to only 44% of the original covered claims, the amount Wartsila actually paid in settlement for the claims covered by the Northbrook policy.
 
 III
 
 17
 The broad form comprehensive liability endorsement purchased by Wartsila contained exclusions for both faulty workmanship and certain completed operations; the district court construed these as excluding from coverage any claim based on damage to engine components that Wartsila performed work on. Wartsila now argues that Northbrook is estopped from relying on the completed operations exclusion; that the exclusion is ambiguous and should not be applied; and that the exclusion for faulty workmanship should have been limited to only the coupling on which Wartsila's work was faulty.
 
 
 18
 With regard to completed operations, exclusion VI(A)(3) provides that there is no coverage:
 
 
 19
 with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations," to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.
 
 
 20
 The "completed operations hazard" is defined as including:
 
 
 21
 bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured....
 
 
 22
 The district court found that an "if any" endorsement in the policy bound the insurance company to coverage of completed operations. We first address the threshold question of the scope of the exclusion, which applies to "property damage to work performed by the named insured arising out of such work or any portion thereof." Identical language has been construed to mean that once work is completed by an insured, damage that thereafter occurs to the work itself is not covered by the policy, under the principle that liability policies are not intended to serve as performance bonds. See Southwest Louisiana Grain, Inc. v. Howard A. Duncan, Inc., 438 So.2d 215 (La.Ct.App.), writs denied, 441 So.2d 1224, 442 So.2d 447 (La.1983). By contrast, consequential damages to property outside the work product arising from completed operations are not excluded from coverage by the provision. The facts of this case illustrate the distinction. Damage caused by failure of the coupling to parts of the engine worked on by Wartsila are excluded from coverage; all other damages are not. For example, had the damaged engine somehow directly caused the M/V TAURO DEL GOLFO to sink, the loss of the vessel would not be within the completed operations exclusion. The exclusion thus leaves upon the insurer significant potential liability arising out of completed operations.
 
 
 23
 Wartsila's argument that Northbrook is estopped from relying on this provision is based on Northbrook's failure to cite the completed operations exclusion in its original letter contesting coverage. The policy was issued and delivered in Louisiana, and pursuant to Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), Louisiana law governs the rights and obligations of the parties. See also Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir.1976), cert. denied, 431 U.S. 967, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977). Under Louisiana law, the application of the doctrine of estoppel cannot be used to extend or enlarge coverage beyond that set forth in the policy. Hunter v. Office of Health Services and Environmental Quality, 385 So.2d 928, 937-38 (La.Ct.App.), writ denied, 393 So.2d 737 (1980). We reject Wartsila's estoppel argument because denying effect to the exclusion on that ground would enlarge the policy coverage, contrary to Louisiana law.
 
 
 24
 Wartsila also argues that exclusion VI(A)(3) is ambiguous because it refers to "any classification stated in the policy or in the company's manual as 'including completed operations,' " and neither the referenced classification nor the manual are elsewhere defined in the policy. Northbrook responds that the language is superfluous and should simply be ignored. We must agree with Northbrook.
 
 
 25
 Where there are two reasonable interpretations of a policy provision, we will construe the provision in favor of coverage. Wartsila, however, has not presented any interpretation of the exclusion arising from its ambiguity that suggests that the policy provides any greater coverage than that determined by the district court, but simply argues that because it is somewhat confusing, the exclusion should not be given any effect at all. In actuality, however, any ambiguity in the exclusion inheres to Wartsila's favor; if the referenced classifications and manual existed, they would only extend the scope of the exclusion still further. We therefore decline to strike the exclusion in its entirety for ambiguity.
 
 
 26
 The district court correctly determined that the completed operations exclusion applied to exclude from coverage only damage to the work product of Wartsila. The court made a factual finding that Wartsila's overhaul of the engine did not include replacement of the crankshaft or engine block, and that neither should be considered part of the completed work product. The substantial damage to the engine block and crankshaft following failure of the coupling was correctly found to be within the policy's coverage for completed operations. Cf. Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401 (5th Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).
 
 
 27
 The other relevant coverage exclusion is contained in section VI(A)(2)(d)(iii), and excludes damage
 
 
 28
 to that particular part of any property, not on premises owned by or rented to the insured ... the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured.
 
 
 29
 Wartsila argues that this provision excludes only damage to the part upon which faulty work was actually performed, but not to work that was correctly performed. We express no opinion about Wartsila's interpretation of this exclusion, because the damage to any engine parts worked on by Wartsila is excluded under the broader completed operations exclusion.[3] We therefore need not decide the question.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 The ill-fated TAURO DEL GOLFO now lies at the bottom of the Gulf of Mexico, following a casualty unrelated to this suit
 
 
 [2]
 Because these were alternative findings, and because the first was not clearly erroneous, we need not reach the question of whether the second finding erroneously shifted Northbrook's burden of proving non-coverage under an exclusion of the policy to Wartsila
 
 
 [3]
 Wartsila argues that Southwest Louisiana Grain, Inc. v. Howard A. Duncan, Inc., 438 So.2d 215 (La.Ct.App.), writs denied, 441 So.2d 1224, 442 So.2d 447 (1983), stands for the proposition that where two exclusions apply, the less restrictive exclusion prevails over the more restrictive exclusion. Wartsila overlooks that Southwest Louisiana Grain recognized the general principle that "exclusions do not extend coverage," id. at 222, but did not apply it because the more restrictive exclusion was contained in the basic policy, while the less restrictive exclusion was included in an endorsement for completed operations. The endorsement was intended to extend coverage, and therefore the court found a conflict between the two exclusions that had to be resolved in favor of the insured. Here, where both exclusions were contained in the same endorsement, one may not be used to extend the coverage excluded by the other