## HEIPERSHAUSEN BROS., Inc., v. CONTINENTAL INS. CO. OF CITY OF NEW YORK.

District Court, S. D. New York.
Nov. 14, 1938.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for libellant.

Bigham, Englar, Jones & Houston, of New York City (Martin Detels and James N. Senecal, both of New York City, of counsel), for respondent.

LEIBELL, District Judge.

Libellant is a ship repairer; respondent is an insurance company. On November 27, 1933, the parties entered into a contract of insurance for ship repairers' liability, the policy of insurance to cover a period of one year, from noon, New York Standard Time, of November 22, 1933, to noon, New York Standard Time, of November 22, 1934.

On November 22, 1934, the tugboat "Dalzellite" was moored at the foot of Rivington Street, East River, New York City. Libellant was employed to do some work on the boiler of the tug and work was begun in the morning of that day. The particular job was the renewal of broken staybolts and necessary caulking around the boiler. In order to remove the staybolts, the men used acetylene torches. Two burners were employed on the job during the day, each had a helper. The men stopped work for lunch around 12 o'clock and returned at 12:45 P. M. At about 4 P. M. they stopped work for the day. The engineer in charge of the tug shortly thereafter closed up the bunker plates and went ashore.

The next morning, November 23rd, the engineer went aboard the tug at 7 A. M. He saw smoke and went down through the engineroom into the boiler room. There he saw a smoldering fire on a shelf on the starboard side of the boiler room. He got a pail of water and extinguished it. The men employed by libellant were informed of the occurrence when they went to work at 8 A. M. that morning.

A suit for the damages caused by the fire was brought by the owner of the tug against this libellant and was settled with the consent of this respondent, but the respondent disclaimed liability under its policy. Later this suit was brought on the aforementioned insurance policy.

The primary question to be decided in this case is whether the fire started before 12 o'clock noon of November 22, 1934. The testimony educed the following facts:—

On the evening of November 21, 1934, the tug "Dalzellite" was moored, starboard side in, to a public dock at the foot of Rivington Street, East River, New York City. About 8:30 A. M. the next morning, i. e., November 22nd, two burners, Underight and Schmepf, two helpers and probably a caulker, went aboard the tug. They were all employees of the libellant and their job was to renew broken staybolts and do some caulking around the tug's boiler. There were at least two members of the tug's crew aboard at that time, the chief engineer and a fireman.

The boiler was of the Scotch Marine type, one commonly in use on tugboats. It was approximately 15 feet in diameter and up at the forward end there was a combus-

tion chamber inside the boiler. The outer shell of the boiler was constructed of steel 1⅜ inches thick. Inside this shell, spaced at a distance of about 7 inches, was the combustion chamber enclosed in a steel wrapper sheet ⅝ of an inch thick. This combustion chamber measured about 12 feet athwartships, 32 inches fore and aft and 10 feet in height. The 7 inch distance between the outer shell and the wrapper sheet of the combustion chamber is the water space for the generation of the necessary steam. Because of the comparative thinness of the wrapper sheet of the combustion chamber, there is danger that it may buckle under pressure. Hence it is necessary to stay it. Ten inch staybolts are run from the outside of the boiler shell through the water space to the inside of the wrapper sheet of the combustion chamber. Libellant's employees were engaged in the task of removing some of these staybolts on November 22nd, with the intention of replacing them with new ones.

The accepted method of removing the old staybolts is by burning them out with an acetylene torch. First one end of the staybolt is burned out, then the other end, and the staybolt drops to the bottom of the water space. The acetylene torches are about 20 to 30 inches long. The men, called "burners", working with the torches, heat the end of the staybolt until the metal reaches a molten state, and then by pulling another lever on the torch, they release oxygen under a pressure variously estimated to be between 30 and 60 pounds. The release of the oxygen under pressure causes sparks and bits of oxide of iron to fly in all directions for a distance of from 3 to 6 feet, described by one of the witnesses as looking "like a flower pot".

According to the testimony of Heipershausen, president of the libellant, and Underight, the latter and Schmepf worked on the outer end of the staybolts on the outside of the boiler during the morning. Schmepf worked on the starboard side of the boiler and Underight on the port side. At twelve o'clock noon they stopped work and went ashore for lunch. They returned around 12:45 P. M. and went inside the combustion chamber and spent the whole afternoon burning out the other ends of the staybolts upon which they had worked during the morning. On cross-examination Underight was confronted with a statement (Exhibit C) which he had signed on March 12, 1935. In it he stated that he had worked on the port side of the boiler all day long burning

from the outside in. He also stated in the said exhibit that Schmepf worked on the backhead of the boiler burning from the outside in, during the morning, and that in the afternoon Schmepf worked inside the combustion chamber on the starboard side burning out the other half of the staybolts. Although Underight admitted that his prior statement was more likely to be correct as being closer to the time of the fire, he insisted at the trial that both he and Schmepf worked inside the combustion chamber in the afternoon and that Schmepf worked both on the backhead and the starboard side of the boiler, about opposite the point where the fire occurred.

The inconsistency between Underight's prior statement and his testimony at the trial as regards the work he himself did is immaterial, except on the question of credibility, in view of the fact that it appears to have been physically impossible for any sparks emanating from the burning on the port side of the boiler to have reached the shelf on the starboard side of the tug where the fire occurred. Schmepf was not called as a witness. He is no longer in libellant's employ and although attempts were made to find him, they were unsuccessful. From the testimony adduced I find that Schmepf worked on the backhead and also on the starboard side of the boiler, within a few feet of the spot where the fire occurred, burning on the outside of the boiler in the morning, and in the combustion chamber in the afternoon.

While Schmepf was working in the combustion chamber in the afternoon the sparks would remain inside until the staybolt dropped and then the flame of the torch and sparks could fly through the hole previously burned in the outer shell in the direction of the skin of the tug. I cannot say that it would be improbable that a spark would reach the wooden shelf while Schmepf was working on the inside of the boiler. It must be remembered that there was a force of 30 to 60 pounds in back of the oxygen fed to the acetylene torch.

The shelf upon which the fire was discovered extended around the inside of the hull, below the deck, for the purpose of reinforcing the hull. The top of the shelf was about 5 inches below the deck. According to Heipershausen the shelf was laminated, was about 32 inches wide and was made up of eight 60 foot lengths of pine wood, each length being 4″ X 6″. Captain Alfred Eriksen, who inspected the boat December 6,

1934, reported that the shelf had only three laminations. The spot where the fire occurred was about 3 feet aft of the forward end of the boiler and about opposite the point where Schmepf had been burning one of the staybolts. The burnt area extended for a distance of approximately 18 inches. The distance from the nearest staybolt to the shelf was estimated to be between three and four feet. Adjacent to the boiler was a longitudinal coaming extending about 6 inches below deck. The distance between the nearest point of the coaming and the shelf was 13½ inches. The bottom of the coaming extended about 1 inch below the top of the shelf.

There was no wiring near the shelf. While working, libellant's employees ran wires from the dock and attached electric lights to them. It was with the aid of one of these lights on the end of a wire that Underight made his inspection before leaving the tug on the afternoon of November 22nd. When the men finished work that afternoon they detached the wires and left them on the tug.

There was one manhole over the boiler variously estimated to have been from 12 inches to 12 feet from the burnt area. In any event it is apparent that it was not directly over the shelf. It was open for ventilation during the day, with only a grating over it. It was closed by the Chief Engineer and the fireman before they went ashore.

The distance between the ceiling or floor of the tug and the shelf was variously estimated as 10 or 12 feet. It could be reached from the scaffolds that libellant's employees had rigged up in order to work on the staybolts. Apparently the only men on the scaffolds were the two burners. Their helpers remained down on the ceiling and their primary function seems to have been to see to it that the flying sparks did not cause any fires. The helpers were supposed to stay on the ceiling outside of the boiler watching for sparks when the burners were inside the combustion chamber. Underight testified that none of libellant's employees smoked while they were on the job.

Libellant argues that the probabilities are (1) that the fire was caused by a spark emitted while burning a staybolt on the outside and (2) that the spark lodged on the shelf before 12 o'clock noon during the time that the burners were working on the outside of the boiler.

Underight testified that he saw no fire and smelled no smoke when he quit at noon time and that at 12:45 P. M. when he returned from lunch he did not see or smell anything burning. He also testified that it was his custom to make an inspection before quitting for the day and that he did not see any smoke or flame. He inspected with a light the part of the shelf that was found to be smoldering and charred the next morning. Besides looking along the shelf, he threw a bucket of water at, or near, the spot where the fire was later discovered. After Underight left the Chief Engineer made a similar inspection; he, too, looked on the shelf. Both of these inspections were made four hours after respondent's policy of insurance had expired. If a fire had started before 12 o'clock noon there should certainly have been some sign of it at 4 P. M.

■■■ Here we have a period of 15 hours from the time libellant's employees and the engineer and fireman left the tug until the fire was discovered. The period from the termination of respondent's policy of insurance till the discovery of the fire was about 19 hours. It is mere speculation to assert that the fire was caused by the use of the acetylene burners and even more so to conclude that the fire must have occurred before noon on November 22, 1934. In fact the weight of the evidence is against any such conclusion.

In the instant case on the one hand we have an asserted chain of probabilities, and on the other direct evidence that no fire was in existence after two thorough examinations made for the sole purpose of determining that fact. The burden rests on the libellant to show by a fair preponderance of the evidence that the fire started while the policy was in force, before 12 o'clock noon on November 22, 1934. National Sugar Refining Co. v. Tietjen & Lang Dry Dock Co., D.C., 33 F.2d 354, 356; Kalgin Packing Co. v. Fire Association of Philadelphia, 9 Cir., 67 F.2d 569. This it has failed to do. The libel is accordingly dismissed.